# HEWLETT v. STEINBERGER.

### PATENTS; INTERFERENCE; PRIORITY.

1. **Claims in an** application for a patent should be given the broadest interpretation consistent with their terms (citing *Lindmark* v. *Hodgkinson,* 31 App. D. C. 612; *Viele* v. *Cummings,* 30 App. D. C. 455; *Miel* v. *Young,* 29 App. D. C. 481), so where the "corrugations" in the disc strain insulators for electric conductors of one of the parties to an interference, properly positioned, perform, and were intended to perform, substantially the same function of the so-called "flanges" and "collars" of the issue, the terms are to be taken as synonymous.

2. **Where the invention** in issue in an interference was disclosed by the junior applicant therein to the senior applicant's companion in a previous joint application covering the same invention, which has been abandoned, and neither the senior applicant nor his former companion has been called to testify that the disclosure was not communicated to him, the presumption is that it was, and the junior applicant is properly awarded priority of invention.

No. 836.  Patent Appeals.  Submitted March 12, 1913.  Decided April 7, 1913.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Affirmed.*

The facts are stated in the opinion.

*Mr. Albert G. Davis, Mr. John F. Bartlett,* and *Mr. Melville Church* for the appellant.

*Mr. Charles H. Wilson* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

Appeal from an award of priority in a Patent Office interference proceeding.

The invention is for disc strain insulators for electric conductors, designed mechanically to secure and electrically insulate two connecting parts. The object sought to be accomplished was to prevent current creepage over the surface of the insulator in wet weather as well as in dry. To accomplish this result irregularities in the surface of the sides of the disc are provided, which are so arranged as to increase its surface without increasing its diameter, and also to prevent the formation of a film of water on both sides of the insulator at the same time. In the claims these irregularities are called "flanges," "annular collars," and "collars." The claims read as follows:

"1. A disc strain insulator comprising suspension members, a mass of insulating material partially enveloping the same, said mass being provided centrally with a disc integral therewith and lying substantially in the general equatorial plane of said mass, and further provided with flanges extending in opposite directions from said equatorial plane.

"2. A disc strain insulator comprising suspension members, a mass of insulating material partially enveloping the same and having a disc portion, said disc portion being provided with

annular collars extending in opposite directions and in the general direction of said suspension members.

"3. A disc strain insulator comprising strain members, a body of insulating material partially enveloping the same and having a comparatively large disc, said disc being provided with collars integral therewith and extending in opposite directions."

Louis Steinberger is the president and general manager of the Electrose Manufacturing Company, of Brooklyn, New York, and a prolific inventor in the art to which the claims of the issue relate. In 1902 he commenced sending to the Niagara Falls Power Company insulating material known in the art as electrose, and various devices made therefrom, for the purpose of testing, so as to demonstrate dielectric · qualities, strength, etc. At that time, and for several years thereafter, an electrical engineer by the name of H. W. Buck was connected with said power company. The relations between Steinberger's company and the power company continued without interruption, and, on September 28, 1905, Buck, for the power company, wrote Steinberger for an experimental insulator "to be made up of a disc of electrose with an electrose hub welded to the center of the disc on either side." A sketch accompanied this letter. On the next day Steinberger replied that he would be glad to construct such an insulator at the expense of his company, advising Buck that they "could construct the die so as to mold the disc and hubs integrally, and also mold the two eye bolts into the hubs." He further advised Buck that the disc could be made 14 inches in diameter, instead of 12 as suggested by Buck. Buck, in replying to this letter, did not refer to the suggestion about the integral relation between the disc and the hub, which, it may be here noted, is a feature of the claims in issue. Buck, however, did request Steinberger to send him "a rough sketch showing exact arrangement of the insulator" to be made. Thereupon, on October 7, 1905, Steinberger wrote Buck in considerable detail concerning the insulator to be made and inclosed sketches as requested by Buck. These sketches showed a disc strain insulator having oppositely

extending protective parts in the form of corrugations upon both sides of the disc. They also showed integrally formed, centrally located, hub portions and molded-in strain members. Of course, these sketches were very much smaller than the proposed insulator. In his letter Steinberger said: "On the inclosed sketch marked No. 2, please note that we have indicated the surface of the disc as being corrugated. Our object for corrugating the planes of the disc is to provide additional surface without increasing the diameter of the disc, thereby providing for surface leakage, and enabling you to impress greater voltage than you could on a disc with plain surfaces." He also directed attention to "our new suggestions regarding the modifications of the surface of the disc, the tapering form of the disc, also a modified form of the hub portion of the disc." On October 11th Buck replied, and in alluding to the feature of the corrugations, said: "In regard to the corrugation on the disc which you have shown in one of your sketches, *I believe this might be of advantage under certain conditions,* but for the purposes of my test I should prefer to have a smooth surface." Nor did he adopt Steinberger's suggestions as to the integrally formed, centrally located, hub portion, but did adopt the suggested idea of the tapering form of disc.

In June, 1907, Steinberger, in reading a copy of the "American Institute of Electrical Engineers," noticed an article therein describing a system of high tension insulation which, according to the article, had been developed by Buck and Edward N. Hewlett, the appellant herein. Shortly thereafter Steinberger saw Buck, and, in a friendly way, criticized the article and claimed the invention himself. Buck did not question Steinberger's claim. Prior to this, on February 15, 1906, and, of course, without the knowledge of Steinberger, Hewlett and Buck had filed in the Patent Office an application for this very invention, which application, before filing, was assigned to the General Electric Company. On April 20, 1907, the present Hewlett application was filed, and also assigned to the General Electric Company. While this application was for the same invention, no reference was made therein to the

prior joint application, and both applications were for some time thereafter prosecuted by the General Electric Company. The joint application became abandoned for failure of prosecution on November 16, 1909. No testimony whatever has been taken in behalf of Hewlett. Steinberger has taken the stand and also introduced corroborative evidence.

The application of Steinberger was filed January 20, 1908, and each of the tribunals of the Patent Office found lack of diligence on his part, and each disposed of the case upon the question of originality, that is, whether Steinberger's said letter of October 7, 1905, with its inclosed sketches, amounted to a disclosure of the invention to Buck. The Examiner of Interferences stated that plain insulators at that time were old, but that the use of corrugations upon the disc type of insulators, as suggested by Steinberger, was new. He concluded, however, that the "flanges" or "collars" of the insulators covered by the issue are more than corrugations, and hence that there was no disclosure to Buck. In no other respect did the Examiner criticize the Steinberger disclosure. It is apparent, therefore, that the criticism with reference to the character of the corrugations was one solely of degree. The Examiner in Chief directed attention to the contention of Hewlett that, even assuming a disclosure by Steinberger to Buck, the evidence was insufficient to support the conclusion that Hewlett derived the invention from Buck. Answering this contention they well said: "It appears, however, that upon February 15, 1906, prior to the filing of Hewlett's application, but after Steinberger's disclosure to Buck, Hewlett and Buck filed an application as joint inventors, disclosing the invention in issue. This circumstance, taken in connection with the fact that Hewlett has not taken the stand to assert that he did not derive from Buck, makes Hewlett's position an impossible one, so far as this point is concerned." They then suggested that each of the counts of the issue would be fully satisfied in the alleged disclosure by Steinberger to Buck, "if the word 'flanges,' in count 1, and the word 'collars,' in counts 2 and 3, should be construed as of sufficient breadth to include the projections which

are formed in the exhibit construction by reason of the fact that the surfaces of the disc are corrugated." They then found that each count defines "a supposed combination in an insulating disc of the oppositely extending flanges or collars and the central mass of insulating material partially enveloping the supports." After discussing two possible interpretations of the claims, under one of which Steinberger could be said to have made a full disclosure to Buck, they said: "We have found it difficult to fasten upon one rather than the other of the two interpretations urged upon us by the parties." They resolved the doubt, however, in favor of Hewlett, and therefore affirmed the decision of the Examiner of Interferences. The Commissioner directed attention to the fact that the disc to which Steinberger referred in his correspondence with Buck was to be 14 inches in diameter, and hence that the relative measurements of the device shown in the sketches sent Buck were to be proportionately increased; in other words, that a disc 14 inches in diameter, with the corrugations suggested in Steinberger's letter and sketches, would present quite a different appearance from a disc one fifth that size. The Commissioner then demonstrated very clearly, we think, that Steinberger, at the time of this disclosure, had in mind the idea of so constructing his device that it would divert moisture, and that the device described in the letter to Buck and shown in said sketches was capable of accomplishing this result. The Commissioner tersely concluded: "The invention of this issue, as in other cases, is a thing, and not words, and in the light of the record the refinements of language should not control; and the words 'corrugations,' 'flanges,' and 'collars,' as used in this case, are held to be synonymous." We fully agree with the finding of the Commissioner that the corrugations of Steinberger, being properly positioned, perform, and were intended to perform, substantially the same function of the so-called "flanges" and "collars" of the issue. The terms are therefore synonymous, as used in this record. This conclusion recognizes the rule that claims should be given the broadest interpretation consistent with their terms. *Lindmark* v. *Hodgkinson,* 31 App. D. C. 612; *Viele* v. *Cummings,* 30 App. D. C. 455; *Niel* v. *Young,* 29 App. D. C. 481.

It is singular, indeed, that intelligent men like Buck and Hewlett could not determine whether they were joint inventors or whether Hewlett was the sole inventor, and it is also significant, in view of the disclosure to Buck, that the original joint application should have been abandoned in favor of the later Hewlett application. It is still more significant that Hewlett, whose joint application with Buck was filed, as we have seen, a few months after Steinberger's disclosure to Buck (which application was not finally abandoned until about three and one-half years later), was not called as a witness. On the face of the record, therefore, Buck and Hewlett have sworn that they were joint inventors of the subject-matter of the issue, and Hewlett has sworn that he was the sole inventor of such subject-matter. These apparently inconsistent positions are unexplained. Had the joint application been involved in this interference, a disclosure to one of the joint applicants would have constituted disclosure to the other. Since neither Hewlett nor Buck has been called to testify that the disclosure of Steinberger was not communicated to Hewlett, the presumption is that it was. Certainly Hewlett's oath in his own application does not overcome that presumption, for, in addition to the fact that he had theretofore sworn that he and Buck were joint inventors, the joint application was not abandoned until the exigencies of the case apparently demanded it.

The decision is affirmed.                              *Affirmed.*